Matter of E.R. v D.R. (2026 NY Slip Op 50095(U))

[*1]

Matter of E.R. v D.R.

2026 NY Slip Op 50095(U)

Decided on January 15, 2026

Family Court, New York County

Antoncic, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 15, 2026
Family Court, New York County

In The Matter of a Family Offense Proceeding: 
 E.R., Petitioner,

againstD.R., Respondent,

Docket No. XXXXX

Attorney for the Petitioner - Amanda Blau Esq., Stephanie Houghton Esq., and Rachel Mckenzie Esq. at Sidley Austin LLP, Attorney for the Respondent - Ryan Besinque Esq., and Attorney for the Child - Anna Schissel, Esq. 

Lydia S. Antoncic, J.

Prior to the instant petition, Petitioner E.R. ("Petitioner") filed a family offense petition on October 7, 2014, in Rockland County against Respondent D.R. ("Respondent""). This petition, along with numerous violation petitions,[FN1]
were later transferred to New York County. After a hearing on August 30, 2017, Judge Karen Lupoloff issued an Order of Fact-Finding and [*2]Disposition [FN2]
("2017 Findings of Fact") and a five-year final order of protection ("2017 Order of Protection") against Respondent and in favor of the Petitioner and the subject child S.R.("Child") that expired on August 30, 2022. In her 2017 Findings of Fact, Judge Lupuloff found by a preponderance of the evidence that the Respondent committed the family offenses of menacing in the 3rd degree, harassment in the first or second degree, and menacing in the second or third degree, as well as aggravating circumstances in that the Respondent repeatedly and intentionally violated the temporary order of protection.
Petitioner filed the instant family offense petition on September 7, 2023. The court issued a temporary order of protection on behalf of Petitioner and the Child against the Respondent, that has been extended throughout the course of these proceedings. Petitioner is requesting a two-year final order of protection on behalf of herself and the Child, and a finding that the Respondent committed the family offenses of harassment in the first or second degree as defined by PL §240.25 and PL §240.26, respectively. By decision dated January 9, 2024, Hon. Stephanie Schwartz dismissed the Petitioner's cause of action for disorderly conduct and menacing in the third degree and struck paragraphs 12 and 14. She also struck a portion of paragraph 16 that refers to "Respondent's knowledge of the history of this case and his knowledge, as a former attorney . . . " as well as portions of paragraph 24 that referred to Petitioner's "legitimate concern that Respondent may abscond with their son" and that "there is no reason for Respondent to contact Petitioner." Judge Schwartz, at page 6-7 of her decision held that the petition adequately alleges a cause of action for harassment in the first and second degree as defined by PL 240.25 and 240.26 and shall proceed given "successive unsolicited communications . . . demonstrate a course of conduct and repeated acts that Petitioner could reasonably be alarmed to receive." Judge Schwartz held that Respondent's intent is a question of fact to be determined at trial, as well as Petitioner's alarm and the reasonableness of her fear of physical injury. Although raised in her petition, petitioner did not seek a finding of aggravated harassment or an award of counsel fees at trial of this matter, nor were these addressed in their summation.
The court held 8 days of fact finding where the parties were represented by counsel, as was the Child. After the Petitioner completed her case, the Respondent made an oral prima facie application, which the court denied.
Petitioner's CasePetitioner TestimonyPetitioner testified that she met Respondent in the summer 2012; they lived together from the end of 2012 to the beginning of 2013 in Nyack. She testified that Respondent engaged in "love bombing." They did not get married. She testified that their relationship changed after they had the Child.[FN3]
Respondent threatened to kill himself, her, her family members, and a stranger. Petitioner described Respondent standing at an open window with the baby; he would block her exit from the apartment and would track her. She was scared he would hurt her or the [*3]Child so she left 5 weeks after the baby was born.
The court took judicial notice of the 2017 Order of Protection. (P-Exh. 4) Petitioner testified that she was also awarded sole physical and legal custody of the Child. Respondent had supervised visits that ended when he gave up right to visits in 2016. As to the instant petition, she testified that on December 23, 2022, she received a call from a nun on Respondent's behalf. She felt jolted when she got the call, but did not take legal action. Respondent then sent an email to Petitioner on March 15, 2023, that she did not respond to. (P-Exh. 1). Petitioner received another email the next day (P-Exh. 2). Petitioner testified that receiving back-to-back emails felt like "it was starting again" and that she felt like the Respondent was threatening to take or harm the Child. It reminded her of the persistence that he attacked and terrorized her with previously.
Respondent next sent an email to Petitioner's brother, which her brother forwarded to her. (P-Exh. 3). She felt as if the barrage of emails starting again were attempts to take the Child. She testified that it was reminiscent of Respondent threatening to take the Child and to jump off of the Tappan Zee bridge. After she received a third email in a 48-hour period, she believed that "he is not gonna stop," and realized that she had to take action to keep her and the Child safe. On April 26, 2023, she received a letter at her home address (P-Exh. 5). She testified that her home address is not publicly available for safety reasons and that the same concerns are why she moved 50 miles away. She testified that receiving the letter was the scariest part and was the reason she decided to take action. 
After this contact from Respondent, she described crying often and constantly locking doors and windows. She took care to be the only one to pick up the Child and told him, his school, and their neighbors to be vigilant. She testified that Respondent finding her address was reminiscent of how he would previously track her. She testified that the letter he sent demanded physical and legal custody of the Child, which felt like a threat to take the Child away from her and made her feel scared.
On cross-examination by counsel for the Respondent, Petitioner testified that her brother was an attorney at Sidley Austin (Tr. 4/1/25 at 7). To her knowledge, Respondent did not contact West Point (where she worked), her friends, or the Child's school and has not contacted her for 10 years as there have been orders of protection in place. Petitioner testified that Respondent is manipulative, deceitful, has no remorse or empathy, no relationship with others, and is impulsive and violent, though he has not been violent to her. She testified that he tried to run her off the road once during supervised visitation and previously sent documents to her workplace that resulted in an employer investigation in 2014. She left the relationship because Respondent said he would harm the Child. She knew of Respondent's criminal conviction before conceiving the Child. She maintained she was afraid that Respondent would take the Child and cause physical harm after receiving the communications at issue in this petition. She testified that she would like Respondent to not contact her directly or indirectly, and that she would prefer he institute legal proceedings even though they are emotionally draining, but necessary, to keep herself and the Child safe.
On cross-examination by the Attorney for the Child (hereinafter "AFC"), Petitioner testified that the nun identified herself when calling and Petitioner responded, "I can't do this with you right now" and ended the call. (Tr. 4/1/25 at 44) She also never shared her new email address with Respondent that he used to communicate with her. As to prior history, she testified that she filed three violation petitions, two of which were related to Respondent communicating with her work colleagues on social media to claim she had post-partum depression and that he [*4]used her checks and bank cards.
On re-direct examination, Petitioner testified that the first email was stamped as sent on Wednesday, March 15th, 2023 at 3:40pm; the second email on Thursday, March 16th, 2023 at 6:23 pm; and the third email Respondent sent to her brother on Thursday March 16th, 2023 at 7:05pm. — noting there was less than an hour between the second and third email. Her brother took a day to forward the third email to her, which he forwarded on March 17th at 9:41pm. The letter was stamped March 17, 2023 (Friday) but she did not know when Respondent mailed it. To keep her address off the internet, she testified that she did not post to social media and looked into how to keep her address private because she did not want Respondent to know where she lives. On re-cross examination, she testified that she created the "profrivera" email address after the temporary order of protection was issued in 2014; she did not communicate with Respondent using that email address but does not know if anyone else sent it to him. On re-cross examination by the AFC, Petitioner testified that in 2016 the Respondent previously sent a letter to the visitation program, the court, and her attorney stating he was no longer interested in visitation with the Child.
Respondent's CaseRespondent TestimonyRespondent testified that he met Petitioner on May 12, 2012. He testified that he was previously convicted of one of count witness tampering and obstruction of justice (combined conspiracy charges). He testified that Petitioner used threats and intimidation to gain power and control over him; she fired his therapist and hired a new one. He stated, "your Honor can throw me at Rikers Island if you don't believe that." (Tr. 4/1/25 at 106)
He denied binge drinking or "popping pills." (Tr. 4/1/25 at 114) He testified that he wanted to get out of the relationship but could not because of the baby. He testified that on September 6, 2014, Petitioner was naked and punched him with a closed hand to his face when he decided to give the baby a pain pill. He testified that he never committed any acts of violence against the Child. He testified that he went out of his was to avoid "any specter that [he was] stalking, harassing" the Petitioner. (Tr. 4/1/25 at 130)
He gave lengthy and detailed testimony about the prior litigation that occurred from 2014-2017 [FN4]
over 3 counties (Rockland, Dutchess and New York County) as examples of why he had no faith in legal system. He testified that he had Sister M call Petitioner because they were both Latina and religious and he thought they would connect. He described Sister M as a mentor and a friend.
After no result came from Sister's M's contact, he contacted Petitioner by email and letter while sitting with his psychologist, as he wanted him to review the correspondence as a "mandatory reporter" to make sure he was not saying anything wrong. (Tr. 4/1/25 at 151) He testified that he still believed there was a small chance they could handle visitation outside of a court hearing; his intent behind sending the emails was to facilitate mediation without court intervention. When he didn't get a response to the email, he emailed Petitioner's brother as he [*5]didn't know if she received the email. He then also sent it to her home address which he found by using google. 
He testified that he mailed two letters to Petitioner- one to her Cornwall on Hudson address and one to her Nyack address. He didn't go to her home as he did not want to put himself into a situation where he would be accused of committing a crime. His intent in having a nun call Petitioner and in contacting her brother was to de-escalate.
On cross-examination by Petitioner's counsel, he testified that he had his last visit with the Child in October 2016. He testified that on August 31, 2017 (the day after default hearing) he had an appointment with Dr. B. He does not dispute Dr. B's notes from that day that he told Dr. B he had trouble getting to court and was 50 minutes late the prior day, but does not have independent recollection. (Tr. 4/3/25 at 63) Later in his testimony, Respondent testified that he called Dr. B on the day of the inquest at 7:00a.m. because he was "having a full blown panic attack," that the Dr. B told him to "stay home," and that he provided contact information for the judge to Dr. B. (Tr. 9/11/25 at 48, 49) He also testified that he attempted to call the court that day, but did not reach anyone and that he "texted or emailed" opposing counsel the following day to "remind[] them of their ethical responsibility to show this to the court... that I'm being told by my psychiatrist to stay home." (Id. at 50) Respondent admitted to filing two Child Protective Service (CPS) reports, and to calling the Clarkstown police to allege that the Child was sick and Petitioner did not take him to hospital. He denied violating prior temporary orders of protection. Respondent gave lengthy testimony about the number of attorneys he had and his fear of being accused of a crime. He testified that he believed that 26 hours was an appropriate amount of time to wait before reaching out to Petitioner again and to email Petitioner's brother 43 minutes later.
On cross-examination by the AFC, he testified that he "found [Petitioner's email] in [his] dropbox . . . of family court issues" in 2023 and that he found her home address through a google search in which the first listing was Zillow with a home in her name. (Tr. 4/10/25 at 53-54) He testified that he waited three months to make contact again as he was devastated that Sister M's outreach didn't work; he did not include a time deadline in the email as that was off-putting language. He testified that he wanted to be able to truthfully tell the court that before he instituted legal action. He testified that he stopped communication with Petitioner after receiving the temporary order of protection ("TOP"). 
He admitted that in 2023 he did not have any insight into the Child's schedule or Petitioner's life at all to know when she would have access to her email or how often she checked it. He testified that he was fearful of reaching out but denied thinking it might cause her distress. After Respondent sent his letter, which he intended to be treated as a legal demand, he stopped as he believed further action, "could or may constitute harassment". (Tr. 9/11/25 at 112, 113)
Sister MSister M testified that she is a retired nun and lives at a convent. She has known Respondent for 10 years; he stayed a few months at the convent until he got on his feet. In December of 2022, Respondent was having difficulty seeing the Child; because both she and Petitioner were Catholic and he thought that would have some influence, he asked her to call Petitioner. She told him that this would not do any good, but he asked her to try.
She testified that she called Petitioner, introduced herself and said, "[D.R.] asked me to call you," and that Petitioner said, "I cannot speak to you." (Tr. 9/11/25 at 11) She then [*6]communicated this to Respondent, and he did not ask to call her again. She had no other communication with Petitioner. 
On cross-examination by Petitioner's attorney, she testified that Respondent had told her about his prior criminal conviction but not what it was for. She knew there was an order of protection against him but did not know each specific finding of fact. On re-direct examination, she testified that she was not aware that findings were issued on default, and did not know that the order of protection expired in August 2022.
Dr. Dore SDr. S is a psychotherapist and psychoanalyst in Nyack (retired from NYU) since 1988; he is licensed in New York State. He has been working with Respondent since March 2021 and mostly meets with him three times a week. He testified that they worked on strategies to figure out ways to get his son back in his life; Respondent wanted to avoid going to court. Respondent did discuss his plan for Sister M to make contact as he wanted to avoid court. The next idea they discussed was to send a letter to Petitioner; Respondent ran the letter by Dr. S who made some corrections to appeal to Petitioner's heart but also to be assertive. As the order of protection expired, Dr. S testified that he did not caution him against communicating with Petitioner because he thought Respondent was making his best effort to avoid court. He testified that Respondent would draft correspondence and then they would review it and make corrections, and his notes reflected that he ultimately indicated that the "email seems fine . . .and encouraged to send." (Tr. 7/1/25 at 40) (See also, P-Exh.12 3/14/2023 entry) They discussed how many ways to send the correspondence (email, to her brother and mail). Dr. S testified that he was not concerned about multiple correspondences to the same person as Respondent wasn't sure if it would reach her.
He testified that Respondent expressed that he felt frustration and anger with Petitioner over her refusal to allow him to see their son; Respondent had wonderful memories about supervised visits and painful feelings about not being able to see his son. 
On cross-examination by Petitioner's attorney, Dr. S testified that Respondent had traumatic prior family court experiences and also spoke about being sent to jail. Dr. S had not seen the 2017 Findings of Fact. Dr. S did not consider whether the email would cause Petitioner fear or alarm. 
After being questioned as to whether there was any mention in their sessions of Respondent's contributory actions, Dr. S ultimately admitted that, based on his notes, it was fair to say that Respondent does not take responsibility for his actions or that he blamed Petitioner solely.
Dr. S testified that, based on his notes, he believes Respondent told him that his email to Petitioner "bounced back," so he forwarded it to Petitioner's brother to ensure she received it. (Tr. 7/1/25 at 83) 
Dr. S testified that he encouraged Respondent to send the letter that referred to "shared legal custody" even though Respondent never had legal custody of the Child. (Tr. 7/1/25 at 84)
On cross-examination by the AFC, Dr. S testified that he did not recall Respondent threatening to kill neighbors and would have been shocked if he heard that. He stated that Respondent's statements to him about being treated unfairly by the legal process influenced his opinions. He knew that Respondent had around 22 previous attorneys and wrote in his notes that the outcome of the custody case was "terribly unfair," but did not recall specifically whether Judge Lupuloff issued that specific order. (Tr. 7/1/25 at 64, 65)
Dr. S testified that he was largely unaware of the history of the case, of Judge Lupuloff's findings, or of the December 22, 2016 ruling by Judge Egitto. Respondent denied threatening to kill himself and Dr. S did not recall discussing Respondent checking Petitioner's phone or tracking her whereabouts. 
On re-direct examination, when asked why his notes do not contain any notations about Respondent taking responsibility, Dr. S testified that when a person feels that they have been victimized for many years, the emphasis tends to be on how they have been affected, although he does believe that Respondent would acknowledge his "part in things." (Tr. 9/25/25 at 29). He testified that Julie Gamache's letter influenced his recommendation as to Respondent's capability as a parent.
On re-cross examination he testified that he took what Respondent told him as the truth, after ensuring "it feels right to [him]" and that his testimony was based on what Respondent and Dr. B told him. (Tr. 9/25/25 at 43, 30) He again testified that he never saw the bounceback email notice. Dr. S testified that Respondent did take responsibility for aspects of the proceeding but could not point to a specific instance when asked.
Dr. BDr. B testified that he is a board-certified psychiatrist for over 40 years, with 55 years of experience as a physician. He first saw Respondent in May 2013 when he came to his office with Petitioner; Petitioner came another time as well. Respondent was anxious, depressed and having anxiety attacks. Dr. B testified that he saw Respondent from 2013 - 2017, starting with every two weeks and then every four weeks or longer.
In 2014, Dr. B was aware that there was an issue as to visitation with the Child, which was supervised, and Respondent was upset they did not have enough time. Dr. B testified that he had an in-person session with Respondent on August 31, 2017 during which Respondent told him that he was 50 minutes late to court and the court dismissed his claim and he had no access to his son. (R-Exh. K, Bates Stamp 52) Dr. B testified that he had a phone call with Respondent "a few days before that" during which the Respondent was having an acute anxiety/panic attack but did not recall the exact timing of the call. (Tr. 9/25/25 at 71) 
Dr. B testified that Respondent had help from Dr. S to write the note to Petitioner, Dr. B was not consulted. In March 2023, Respondent's mood had improved as he had been in treatment with Dr. S for some time; he described Respondent as calm, collected and able to cope with things more effectively. Respondent did express anger but according to Dr. B it was never out of control. Dr. B testified that he would be surprised if someone called Respondent a "madman" as he was well-organized, not psychotic or delusional, and rational with no complaints from the community. (Tr. 9/25/25 at 86) Respondent had never expressed any desire to harm Petitioner, the Child or anyone else. He testified that he never doubted anything Respondent told him but never tried to corroborate; stating "I can tell if somebody is telling the truth or not." (Tr. 9/25/25 at 90)
On cross-examination by Petitioner's counsel, Dr. B was asked about his affirmation wherein he stated that Respondent is not a threat to himself or others, and stable and fit to parent. (P-Exh. 15) He testified that he never witnessed Respondent caring for the Child and this assessment was all based on what Respondent told him. Dr. B did not agree that Respondent does not take responsibility for his actions. He was not aware of the 2017 Findings of Fact or that Petitioner was awarded custody of the Child. 
Dr. B testified that his notes from August 31, 2017 did not mention Respondent having a [*7]panic attack, nor did the August 21, 2017 note, and there was no note for a phone call he had with Respondent as to a panic attack. Dr. B first spoke to S in 2021. They spoke about Respondent's treatment and the letter to send to Petitioner. Dr. B testified that he was "not involved in wording of email" but Dr. S did not reach out for advice beforehand. Dr. B maintained that Respondent is not a danger to himself or others even when made aware of the 2017 Findings of Fact. 
When asked by Petitioner's counsel about Respondent's MMPI results, Dr. B testified that he reviewed the MMPI evaluation from 2016 or 2017 but that "we can't base the whole assessment on one test only." (Tr. 9/25/25 at 123, 134) While he was aware of the Narcissistic Personality Disorder diagnosis of Respondent, he didn't treat him for it as he didn't agree with the diagnosis; he is not treating Respondent for any personality disorders. (Tr. 9/25/25 at 124) 
On cross-examination by the AFC, Dr. B testified that he reviewed the MMPI but did not review the evaluator's experience/qualifications and did not review what collateral information the evaluator considered but knows that the evaluator had asked for his own notes. Dr. B testified that "MMPI results can be situational and affected by stressors" but did agree they could reflect a patient's mental state at the time of examination. (Tr. 9/25/25 at 135) Dr. B testified that he did not think it was paranoia that Respondent thought that Petitioner was behind his credit card theft, but he did not question the basis. As to Respondent having "44 lawyers," Dr. B testified that this did not raise any concerns to him; he was not aware of any court rulings as to Respondent being antagonistic, or that he harassed his attorneys. (Tr. 9/25/25 at 138, 140).
Dr. B testified that he provided a written note for Respondent with a recommendation not to attend court, but later testified that he did not recall specifically whether he wrote this note, that he did not keep a copy, and that he could not recall the exact timing. In Spring 2023, Respondent told Dr. B that there was a 1- year order of protection against him; he did not recall if Respondent told him it was a 5 year order of protection.
On re-direct examination, Dr. B testified that he thought it better for Respondent to reach out to Petitioner through a third party rather than himself, as believed Respondent would get no response or an adverse response. He testified that doing an MMPI for a person with PTSD and anxiety will impact how person understands and responds to questions and impacts accuracy. Dr. B testified that he does not believe he has to observe a person parenting to determine that he will be a fit parent; he did not recall if he reviewed any of Respondent's supervised visitation reports. Upon re-cross examination, Dr. B testified that his 2023 assessment of Respondent's fitness to parent was based in part on Respondent's statements about his visits with the the Child from 2014 to 2016.
Petitioner's SummationPetitioner argues that she has established, by a fair preponderance of the evidence, that she has established the family offenses of harassment in the first and second degree as defined by PL §240.25 and 240.26, respectively. Petitioner argues that her evidence is credible and reliable and that Respondent's testimony should be disregarded as incredible, as well as that of his three witnesses who are biased and lack information as to Respondent's past threatening and aggressive behavior, their only source of information being Respondent. She requests a two-year final order of protection on behalf of herself and the Child.
Specifically, she argued that Judge Schwartz's decision dated January 18, 2024 found that "the successive unsolicited communications form Respondent via third person on the phone, via email and via regular mail demonstrate a course of conduct and repeated acts that Petitioner [*8]could reasonably be alarmed to receive." She argued that the successive communication particularly in light of her refusal to communicate with Sister M, the "legal demand" for custody and the extensive history made her reasonably fear for her and the Child's safety and that he would try and take the Child away.
Petitioner argues that circumstances warrant an inference that Respondent's intent was to harass her and points to testimony that established that Respondent relinquished supervised visitation in 2016, failed to seek reunification with the Child from 2017-2023, and as a results, his "demand" for physical custody felt like an attempt to threaten and intimidate her rather than an attempt to develop a relationship with the Child. She contends that Respondent's general demeanor was defensive and his "persistent contradictions and misstatement of facts render his testimony incredible and unreliable" related to the reason for his default before Judge Lupuloff and prior proceedings. She points to Respondent's testimony that he expected Petitioner to respond to his email in 20 minutes, after no contact for 5 years, together with his experience as a disbarred attorney and testimony related to what amount of contact he believed would constitute harassment establishes his intent to harass. She argues that Respondent's experience as a lawyer makes him aware of the difference between requesting visitation and custody and his choice of the latter, after not seeing his son in 6 years is further indicative of his intent to alarm or scare Petitioner.
Respondent's SummationRespondent argues that the only question before the court was whether Respondent's communications amounted to harassment as a course of conduct as defined in PL §240.26(3), noting that there was no evidence or testimony presented at trial that lends itself to an inference that Respondent's actions constitute actual or attempted physical contact with Petitioner or that he followed her in a public place.
Respondent argues that Petitioner failed to meet her burden in proving that Respondent "acted with the conscious objective to harass, alarm or annoy her," citing to PL §15.05(1). He submits that his "conscious objective" was to open a lawful path toward shared custody and reunification with the Child, and that Petitioner's subjective intent is insufficient to support the inference of intent, citing People v. Ramnerine, 184 Misc 2d 292 (App. Term 2d 2000)
He characterizes his communications as "brief, polite, and expressly framed as a legal demand for 'shared and legal physical custody' . . ." and contains no insults, threats, vulgarity or other language to alarm Petitioner. Respondent argues that the surrounding circumstances demonstrate that his intent was to foster reunification, not harassment, noting his consultation with Dr. S and Dr. B and choice of an intermediary in Sister M. He argues that Petitioner's testimony concedes that Respondent never physically harmed her or the Child, never came to her home uninvited or was seen lurking in her neighborhood. Further, he submits that neither Petitioner, nor her attorney or attorney brother ever communicated to Respondent that Respondent's attempts to communicate with Petitioner were unwelcome or construed as harassment. He contends that his communications were for a legitimate purpose and must be evaluated within their context, citing People v. Stuart, 100 NY2d 412, 429 (2003), and argues that the testimony of his three witnesses supports this conclusion.
Respoondent argues that Petitioner's evidence is not credible as she offers no corroborating or other evidence for proof of her characterization of Respondent as a "madman," and cites to perceived inconsistencies in the prior proceedings between the parties.
In conclusion, Respondent requests that Petitioner's petition be dismissed and that the [*9]court decline to issue any further order of protection. However, if the court were to enter any relief, Respondent submits that a short, suspended judgment would be appropriate given Respondent's non-violent history and compliance with existing orders. He further contends that there is no basis to include the Child should the court deem it appropriate to issue an order of protection.
AFC's Summation
The AFC argues that the Petitioner has established the family offense of harassment in the first and/or second degree by a fair preponderance of the evidence. She asks the court to grant a two year full stay away on behalf of the Petitioner and the Child.
The AFC argues that the court should consider the incidents in the petition in the context of the prior 2017 Order of Protection, which expired months before the Respondent's outreach. Noting that the court heard from multiple witnesses, the AFC argues that the testimony of Respondent's witnesses "only served to reinforce that the communications constituted a family offense." The AFC submits that the outreach from Sister M, the emails, and the letter were all largely the same — including that each proposed a third party to mediate his 'legal demand.' She therefore argues that Respondent's "successive, unsolicited communications" amount to a "course of conduct" under PL §240.25 and PL §240.26.[FN5]

The AFC points to the 2017 findings against Respondent that he repeatedly threatened to take the Child away, to jump with him off the Tappen Zee Bridge, to kill their neighbors, and that he repeatedly acted in an aggressive and threatening manner with Petitioner, causing her to flee the home. Given that history, the Petitioner testified to the ways in which her "alarm escalated" and she felt "terrorized" when Respondent sent his emails after the call from Sister M. The AFC argues that the court should consider the parties history in assessing Petitioner's reasonableness, citing Christina Z. v. Bishme AA., 132 AD3d 1102 (3rd Dep't 2015) where the court found that past domestic violence was relevant to a mother's later fear.
The AFC argues that the Respondent's intent can be inferred from the surrounding circumstances, but also that the Respondent knew he would cause her alarm, citing his testimony "I knew deep down this is going to provoke the wrong reaction, wrong to me." (Tr. 4/3/25 at 45). The AFC refers to Respondent's "jump to demanding shared custody" after so many years as an "irrational act" and points to Respondent's own acknowledgement that they had only an "infinitesimal chance" to resolve the matter outside of court. (Tr. 4/1/25 at 152). She argues that Respondent attempted to point to past traumatic experiences with the court and attorneys to justify his behaviors, while denying the detailed findings against him by many different jurists across many counties.
The AFC argues that the testimony of his witnesses demonstrates that the Respondent withheld "essential background information" from his mental health providers that he enlisted to advise or advocate for him. Based on this fact and the Respondent's own testimony that he knew Petitioner would react poorly to his outreach, which he believed only had an "infinitesimal" chance of success, the AFC argues that the court should find his communications served no [*10]legitimate purpose and were intended to cause Petitioner alarm and fear. 
Findings of FactAt the outset, this court has jurisdiction over this matter pursuant to FCA §812(1) given the parties both testified as to their intimate relationship and have a child in common.
The court has had the opportunity to assess the demeanor and credibility of the witnesses during testimony, as well as to observe the parties' demeanor in the courtroom throughout the proceedings.[FN6]
 The court finds that Petitioner testified credibly, and that her testimony was not impeached in any material way. She testified credibly regarding the domestic violence history between the parties and appeared to be in palpable fear during her testimony. It is undisputed that the Respondent had Sister M reach out to Petitioner on December 23, 2022, and when she did not respond after approximately three months, he then sent 3 emails within 48 hours of each other on March 15 and 16, 2023, followed by a letter to her home. Specifically, she testified why that history, which included threatening to take the Child and jump off the Tappan Zee bridge made her feel as if it "was starting again" when he sent her a "legal demand" to share legal and physical custody of the Child. She testified credibly that she had moved 50 miles away to keep herself and the Child safe, so it was particularly alarming when Respondent managed to find her home address to send her a letter and used an email address that she had never given him. She described in detail the fear she experienced when Respondent located the Petitioner's address, in light of his prior "tracking of her."
The court does not credit the Respondent's testimony. To the extent that his testimony corroborated that there were incidents between them, he attempted to diminish his participation, submitted a convoluted version of the facts, or created an alternate version of facts that were not supported by the record as will be detailed below. During his testimony, Respondent characterized himself as the victim and Petitioner as the aggressor which the court finds incredible. During his testimony as to an incident on September 6, 2014, he made repeated references to Petitioner being naked and to her specific body parts in an obvious attempt to humiliate and belittle her. The court finds the bulk of Respondent's testimony to be self-serving, off topic, irrelevant and rambling. He testified repeatedly that he went out of his way to avoid "any specter that he was stalking, harassing [Petitioner]," which suggests to the court that he was very aware of the impact of sending multiple correspondences to Petitioner during a short period of time given the history of this case, which included a finding of aggravated harassment, and a five-year order of protection issued against him. While he attempted to portray these communications as innocuous, they were not when considering the context and impact on Petitioner. 
He gave sensational testimony about the history of the case, and the injustice he suffered, as a basis to explain his attempts to reach Petitioner directly rather than through commencing [*11]legal action, yet largely ignored the findings made in those cases that reflected poorly on him.[FN7]

Respondent continued to testify as to hearsay statements, despite being directed repeatedly not to do so. At one point, he texted his attorney during his testimony and indicated he didn't know this was improper. Respondent did not dispute Dr. B's notes that on August 31, 2017 (the day after the default hearing) he told Dr. B that he had a problem and arrived to court 50 minutes late. However, he also testified that he called Dr. B on the day of the inquest to say he was having a panic attack and claimed that Dr. B directed him not to attend the hearing.
In his testimony, Respondent took great pains to convince this court that his communications were meant to avoid legal action, but this is belied by the request, which on its face asks that it be treated as a "legal demand." (P-Exh-1, P-Exh-2, P-Exh-3, and P-Exh-5). He asked for joint legal and physical custody of the Child, after not having seen him for approximately 9 years and after his last visits were supervised. The email infers future legal action, which belies his testimony that he was afraid or gun-shy of using the legal system. He testified that he did not contact Petitioner after he sent the last letter as he thought it would constitute harassment and further opined that "he knew West Point was out," and "why am I going to get her in trouble at work . . . there's boundaries." (Tr. 4/3/25 at 42) This makes clear to this court that Respondent was well-aware of the potential impact on Petitioner, and of his intent to cause her alarm and to harass her, despite his statements otherwise. After Petitioner declined to communicate with Sister M, this should have been a clear sign to Respondent that Petitioner did not wish to communicate with him directly either. However, instead of weighing other options, Respondent chose to send four separate communications to her within 48 hours, which was clearly an escalation. 
As to the other witnesses, the court found Sister M to be credible. She largely corroborated Respondent's version of events related to her involvement, however, she did not know the history or background of the case, which included the specific findings in the 2017 Findings of Fact, and her testimony was not particularly probative given her lack of involvement as to the subsequent communications.
The court found Dr. S's testimony to be overall credible and well-intentioned, but it was quite clear that he was unaware of the entire history of the case and basically accepted [*12]Respondent's statements without further inquiry. Respondent essentially used Dr. S as "cover" for his actions, without Dr. S having the necessary background. The court also found Dr. S's judgment to be at times questionable, such as maintaining that he had "no concern" about Respondent sending Petitioner two emails within 24 hours even after he was made aware of the 2017 Findings of Fact. Dr. S testified that he did not consider whether the email would cause Petitioner fear or alarm, and instead was more focused on Respondent feeling victimized, which made his advice and counsel questionable, at best. Despite his role as a therapeutic provider and his lack of any legal training, Dr. S assisted Respondent in drafting legal demand letters and advised him on his efforts to seek legal custody and visitation with the Child. Indeed, Dr. S's unfamiliarity with the history of this case, coupled with Respondent's failure to provide him with a complete background, bolsters the conclusion that Respondent's true intent in communicating with Petitioner was to harass and/or annoy her and he was using Dr. S as a shield.
The court does not credit Dr. B's testimony. While the court did not find his testimony to be untruthful, he was defensive, evasive, appeared to demonstrate bias and questionable judgment. He opined on Respondent's parenting ability without ever observing him parent and admitted to basing his assessment solely on what Respondent told him. He was defensive when asked if Respondent solely blames Petitioner for his woes or if Respondent takes responsibility for his actions, despite his own notes that stated just that. Dr. B often shifted the subject, spoke over the attorney questioning him (after being directed not to) and never questioned the potential import of Respondent having had dozens of lawyers or whether Respondent's behavior played a role. Dr. B largely dismissed the significance of the 2017 Findings of Fact stating that one must "look at the context." He gave evasive answers as to whether it was his clinical recommendation for Respondent not to attend the 2017 fact finding. But most concerning was his testimony (and dismissal) when asked about a MMPI report which diagnosed Respondent with narcissistic personality disorder.[FN8]
Despite this diagnosis, Dr. B felt it was not necessary to treat or verify, "because [he didn't] agree with that," or apparently do any due diligence to assess whether his patient needed further help; all of which demonstrate questionable judgment as a medical professional. (Tr. 9/25/2024 at 121-124)
Conclusions of LawBased upon review of the testimony and the evidence that was presented, as well as the applicable statutory authority, the court finds that Petitioner has met her burden of proof and has established by a fair preponderance of the evidence that Respondent's actions constitute a family offense. See, FCA §832; Wright v. Wright, 4 AD3d 683 (3rd Dept., 2004); see also, McGuffog v. Ginsberg, 266 AD2d 136 (1st Dept., 1999). The court finds that Respondent committed harassment in the second degree, as defined by PL §240.26 (3)[FN9]
when he sent repeated [*13]communications to Petitioner within the span of 48 hours, approximately three months after Petitioner declined to speak to Sister M, and that his actions alarmed her and served no legitimate purpose. Respondent's persistent attempts to reach out to Petitioner, including finding her current home address, is demonstrative of his intent. These actions and communications, when taken in context with the history between the parties, his lack of contact with the Child for years, and this court's credibility findings, establish a "court of conduct" that undeniably alarmed Petitioner and served no legitimate purpose. In making this finding, the court notes that the statute, on its face, articulates that the standard is not whether Petitioner has been harassed, annoyed, or alarmed but instead whether Respondent intended to do those things.[FN10]
Intent can be inferred from the act itself or from the Respondent's conduct and the surrounding circumstances. People v. Bracey, 41 NY2d 296, 301 (1977); See also, Debra SS. v. Brian TT., 163 AD3d 1199, 1204 (3d Dep't 2018); People v. Coveney, 50 Misc 3d 1, 7, 21 N.Y.S.3d 523, 527 (App. Term 2015); Patricia H. v. Richard H., 78 AD3d 1435, 1436-1437 (3d Dep't 2010). 
Pursuant to FCA §842[f], the Court has discretion to award attorney's fees to the Petitioner. Although she requested counsel fees as part of her petition, Petitioner failed to present any evidence supporting a request for attorney's fees during hearing of this matter and did not address, or renew her request, in her summation. Accordingly, Petitioner's request for fees is denied. See also, Matter of Michelle S. v. Luke R., 192 AD3d 427 (1st Dep't 2021); Matter of W.M.S. v. E.J.J., N.Y.L.J. 3/29/04, p. 20 (Fam. Ct. Nassau Co. 2004).
Disposition [FN11]

A Final Order of Protection will be issued against the Respondent and in favor of the Petitioner and the Child for a period of 2 years. (See, DRL §252; FCA §827[a][vii]; See, Matter of Hazel P.R. v. Paul J.P., 34 AD3d 307 (1st Dept., 2006); Matter of Phillips v Laland, 4 AD3d 529 (2d Dept. 2004) lv denied 3 NY3d 609 (2004).
Accordingly, it is therefore,
ORDERED, that Petitioner's Family Offense Petition is GRANTED, and a two-year order of protection shall be issued in favor of Petitioner and the Child and against Respondent. Specific terms to be contained in a separate order; and it is further
ORDERED that any relief not specifically granted is otherwise denied.
This constitutes the decision and order of this court.Dated: January 15, 2026New York, New YorkENTER:Hon. Lydia S. Antoncic, J. F. C

Footnotes

Footnote 1:Violation petitions were filed on October 23, October 24, and November 7, 2014, as well as on May 13, 2015.
Footnote 2:The original order was dated August 30, 2017, and an amended order to include all of the docket numbers was issued September 7, 2017.

Footnote 3:The court allowed limited testimony as to the history of their relationship for background purposes.

Footnote 4:This included testimony about "being handed a check for $10,000" (Tr. 4/3/25 at 24) and attacked by his then-attorney, who punched him in the ribs resulting in 11 broken ribs (Tr. 4/1/25 at 114) and a $5,001 campaign contribution being given to the family court judge presiding over the case from Petitioner's then-attorney (Tr 4/11/25 at 134).

Footnote 5:Citing Inez A. v. David A., 222 AD3d 547 (1st Dept 2023) (multiple text messages and requests for unnecessary wellness checks established a course of conduct of harassment, even though they occurred over a relatively short period of time), see, e.g., Wandersee v. Pretto, 183 AD3d 1245 (4th Dept 2020) (pattern of behavior or course of conduct is comprised of a series of acts over a period of time, however short).

Footnote 6:Although the court only considers competent, material and relevant evidence which was presented during the course of the fact-finding hearing (FCA §834) and has disregarded any hearsay, the court's assessment of each party's credibility is also based on its observations of the parties during the numerous appearances in the instant court proceeding.

Footnote 7:On July 6, 2017, Hon. Karen Lupuloff found Respondent no longer eligible for assigned counsel after his 23rd attorney sought to be relieved, finding "due to his continuing inappropriate, harassing, and threatening behavior [Respondent] has intentionally and purposefully thwarted the ability of appointed counsel to assist him and ... he has therefore intentionally and purposefully waived his constitutional right to appointed counsel." (July 6, 2017 "Order"). As stated previously, Judge Lupuloff later found by a preponderance of the evidence that Respondent committed the family offenses of menacing in the 3rd degree and harassment in the 2nd degree as well made a finding of aggravating circumstances such to warrant the issuance of a five-year order of protection in favor of Petitioner and the Child. (September 7, 2017 "Order of Fact Finding and Disposition Corrected to Include All Dockets") While Respondent repeatedly attempted to discredit or invalidate Judge Lupuloff's findings, they are the law of the case. See Matter of Dondi v. Jones, 40 NY2d 8, 15, 386 N.Y.S.2d 4, 351 N.E.2d 650 (1976); see also Martin v. City of Cohoes, 37 NY2d, at 165, 371 N.Y.S.2d 687, 332 N.E.2d 867 (1975).

Footnote 8:Counsel referred to these specific findings from the report in her question during cross examination after Dr. Bhana indicated his familiarity with the report (Tr. 9/25/25 at 123), however the MMPI was not entered into evidence.

Footnote 9:Harassment in the second degree as defined by PL §240.26(3) provides that a "person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . " (3) he or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose."

Footnote 10:See People v. Caulkins, 82 AD3d 1506, 1507, 919 N.Y.S.2d 597, 599 (3rd Dep't 2011) (The reaction or perception of a victim is immaterial in establishing the defendant's intent).

Footnote 11:In addition to the fact-finding, counsel was afforded the opportunity to submit written submissions as to disposition.